Troy NATION, Harry Walton, and
Shelvie L. Wesley

v.

WINN–DIXIE STORES, INC., and
Winn-Dixie Atlanta, Inc.

Civ. No. C80–1468.

United States District Court,
N.D. Georgia,
Atlanta Division.

July 1, 1983.
Reconsideration Granted Sept. 23, 1983.

William Hazleton, Anglin & Sweet, P.C., Bensonetta Tipton Lane, Atlanta, Ga., for plaintiffs.

John W. Collier, Ogletree, Deakins, Nash, Smoak, Stewart & Edwards, Atlanta, Ga., Kenneth G. Mall, Jacksonville, Fla., Donald A. Cockrill, Greenville, S.C., for defendants.

## ORDER

ORINDA D. EVANS, District Judge.

This action under Title VII[1] and 42 U.S.C. §§ 1981 and 1985 is before the Court for findings of fact and conclusions of law following a non-jury trial.

Plaintiffs are three black employees of Defendant Winn-Dixie Atlanta, Inc. ("Winn-Dixie") who allege that their promotional progress at Winn-Dixie has been impeded because of their race. Winn-Dixie operates a chain of supermarkets in the southeastern United States, including the Atlanta and surrounding areas where Plaintiffs are employed. Plaintiff Troy Nation is a supermarket produce manager who contends that but for Defendants' discrimination, he would now be in a higher managerial position. Plaintiff Shelvie Wesley is a supermarket clerk who contends he was delayed in getting training to make him eligible for a department manager's job. Plaintiff Harry Walton is a supermarket clerk who contends Defendants "set him up" in a department manager's job under circumstances calculated to ensure that he would be unsuccessful.

Following denial of Plaintiffs' motion for class certification, the case came on for trial on October 4, 1982 on the individual claims of Plaintiffs Nation, Wesley and Walton.[2]

The Court makes the following findings of fact and conclusions of law on the liability issues[3]:

## I. *Winn-Dixie Organization and Personnel Structure*

Defendant Winn-Dixie Atlanta, Inc. is a wholly-owned subsidiary of Defendant Winn-Dixie Stores, Inc. The so-called Atlanta Division[4] of Winn-Dixie Atlanta, Inc., which actually includes most of the state of Georgia, is split into two districts. Each of these districts is in turn divided into five "territories,"[5] and within each territory there are approximately seven or eight retail stores, *i.e.*, supermarkets. Each territory is headed by a retail store supervisor who makes the hiring, firing and promotional decisions for employees within the territory in conjunction with the relevant store manager, *i.e.*, supermarket manager.

Each Winn-Dixie supermarket has basically the same personnel structure, starting at the top with a store manager and assistant manager. Under these are individual department managers. These include market manager (in charge of the meat department), produce manager and dairy/frozen food manager, and junior assistant manager. The junior assistant manager is, among other duties, in charge of the grocery department and is sometimes called grocery manager.

Each supermarket department has full-time and part-time clerks who work under the department manager. Most new employees are hired as part-time clerks.[6]

There is a departmental hierarchy within the supermarkets which is reflected in promotional patterns. Generally full-time employees are "trained"[7] first as cashier and grocery clerks. The preferred route is then for grocery clerks to be trained as dairy/frozen food clerks and then produce

---

1. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

2. Suit was originally brought by four named Plaintiffs but the claim of Leonard Collins was dismissed with prejudice at the start of trial on counsel's announcement that Collins did not wish to pursue his claim.

3. The parties agreed to bifurcate the liability and remedy portions of the trial.

4. Within the Atlanta Division there are 73 Winn-Dixie supermarkets.

5. The three named Plaintiffs have worked in three "territories" in the greater Atlanta area.

6. Part-time employees may work forty hours a week. They are paid at a lower hourly rate than so-called full-time employees and are ineligible for the training programs described hereinafter. Part-time employees are regularly promoted to full-time status. Such promotion is regarded by employees and management as recognition that the promotee has potential as a long-term Winn-Dixie employee.

7. *See* discussion of training at page 1000 and n. 12 *infra.*

clerks. The company attempts to see that clerks receive training in all departments before moving to department manager jobs.[8] The preferred departmental management progression [9] is (1) dairy/frozen food manager; (2) junior assistant manager; (3) produce manager, in that order. Produce manager is the plum of the departmental management jobs, with incentive bonuses and a higher rate of hourly pay. Company officials testified that they regard produce manager as a position of greater responsibility than junior assistant or dairy/frozen food manager because of the perishable nature of the products and the judgment which must be exercised in placing weekly orders. Service as a produce manager is nearly always a prerequisite for further advancement in the store structure to assistant manager and manager.

Although Winn-Dixie refers to its supermarket department heads as managers, the evidence shows that these positions are nonetheless "line" jobs. All are hourly paid. While these jobs involve supervision of clerks [10] and a certain amount of independent judgment, they also involve substantial participation in routine physical labor such as keeping shelves and cases stocked, putting dates on products and "rotating" products on the shelves. The actual day to day management of the store, including major decisions affecting departments, is performed by the store managers in close conjunction with the territorial supervisors.[11]

## II. *Training and Promotions*

Winn-Dixie has formal training programs for its full-time clerks in the various supermarket departments. These training programs have a dual aspect. First, they mutually benefit the clerk and the employer by providing training which better equips the clerk to do his or her job. Second, and more important with respect to the instant litigation, successful completion of the relevant training program(s) is a stated prerequisite to becoming a department manager.

Placement in a training program is not automatic when a clerk is initially brought into a department. In the first place, only full-time clerks are eligible for "training" as that term has been used in this litigation.[12] In the second place, because of the nature of the training and the department manager's participation in it, only one clerk in a department is trained at a time. The training programs last from a period of a few weeks up to twelve weeks, depending on the department.

"Training" within various supermarket departments includes studying of standard reading materials and taking open book tests. The reading material conveys substantive information helpful in correctly performing clerical tasks in the relevant department, and also appears calculated to focus employees' attention on general business concepts, *e.g.*, profitability and the importance of pleasing customers. If an employee does not pass the open book test the first time, he simply keeps taking it until he

---

**8.** Winn-Dixie freely waives this requirement when business needs make it desirable to do so. The evidence indicated this occurs frequently, especially with respect to the junior assistant manager and dairy/frozen food manager position.

**9.** The Court uses the term "preferred progression" advisedly. The evidence is clear that personnel decisions quite frequently deviate from the progression due to the needs of particular stores, the availability of openings, and the job performance of individual employees.

**10.** In some cases a department manager supervises only one clerk. Typically he or she supervises several clerks.

**11.** Although the retail store supervisors are responsible for a territory of seven to eight stores, they are very actively involved in the management of each individual store in their territory and spend a substantial amount of time making rounds to each store.

**12.** All of the named Plaintiffs complain of delays in receiving training. It is important to note that "training" for full-time Winn-Dixie employees has a highly specific meaning, as described herein. It does not merely mean on-the-job experience.

does. Additionally, "training" includes performing standardized work assignments under the supervision of the department manager. Finally, employees in training attend lectures at centralized company locations on various aspects of work within their department.

An employee who completes training in a department receives a certificate indicating that training has been successfully completed. Receipt of the certificate signals, among other things, the employee's eligibility for consideration as department manager.

Other than the training just described, there is no formal program for employees who wish to become department managers in Winn-Dixie supermarkets. There are no minimum educational requirements. There is no required period of service within a department or length of service with Winn-Dixie before the employee may become a department manager. Winn-Dixie generally requires that persons aspiring to department manager positions complete the described training within a given department before becoming manager of that department.

Winn-Dixie has a promote-from-within policy. Promotional openings are not posted. There is no formal way for employees to make their interest in advancement known to their supervisors. In many cases the supervisor does not even ask employees of their interest before making personnel decisions.

Retail store supervisors make decisions regarding promotions to department manager positions based on their assessment of a candidate's performance, ability and attitude. Company officials testified that seniority is only one of many factors considered, and is not a major factor unless all other qualifications are equal.

*Individual Claim of Troy Nation*

Plaintiff Troy Nation is a 27-year-old black male who is presently a produce manager at Winn-Dixie's Hiram, Georgia supermarket. He became a produce manager in March 1981. Nation claims that but for Winn-Dixie's discriminatory treatment of him, he would have been made a produce manager as early as 1976. He further contends that had he been, he would now be entitled to higher placement on Winn-Dixie's promotional ladder. For the reasons that follow, the Court agrees.

At all times pertinent, Nation has worked in Winn-Dixie's "West Georgia" territory which lies to the west of downtown Atlanta. Hal Sparks was the retail store supervisor in charge. That territory has supermarkets in Marietta, Mableton, Smyrna, Austell, Hiram, and Douglasville, Georgia.

Nation was hired in June 1974 as a grocery clerk at the Douglasville store. He completed grocery training in November of 1975 and became junior assistant manager there in February 1976. He worked as a dairy/frozen food manager at the Mableton store from October 1976 to November 1979. In early 1976, Nation began asking Sparks to give him produce training so he would be eligible to become a produce manager. It is undisputed that between February 1976 and December 1978, Sparks made produce training available to fifteen white employees, all of whom had less seniority and less experience than did Nation. It was not until 1981 that Nation finally received produce training and became a produce manager.

The evidence established that during his tenure at Winn-Dixie, Nation has been considered a good to excellent employee. James Bonner, who is presently employed by Winn-Dixie, so testified. So did Dennis Hallman, another employee of Winn-Dixie. Stanley Shadrix, a former employee, agreed with this assessment. Shadrix further testified he had heard Bobby Wester state that Nation was the best junior assistant manager he had ever seen. Wester, who is presently a Winn-Dixie employee, was called to the witness stand and denied making that statement; however, the Court finds his denial was not credible.

The evidence further showed that Nation has won several company sponsored contests for outstanding performance. He twice was named as one of Winn-Dixie's "top potential promotable employees." After he was finally promoted to produce manager in March 1981, his department was among the division leaders in sales and profit performance.

Nation's supervisor Hal Sparks, who made all decisions relative to Nation's training and promotions, was called to the witness stand during Plaintiffs' case-in-chief and was asked why Nation had not received produce training and promotion to produce manager earlier than he did. Sparks gave several reasons. He said Nation had not been promoted to produce manager because he did not have the required produce training. He said he had not given Nation produce training for several reasons: (1) for a time Nation experienced some difficulties as an employee which he felt precluded such advancement; (2) that Nation was unwilling to take a pay cut in order to become a clerk ·in the produce department and thus be eligible for produce training; (3) that the white employees who received the training and promotion were considered by him to be "the best man for the job." The Court will discuss each of these in turn.

Regarding Sparks' explanation that Nation could not be promoted to produce manager because of lack of produce training, the Court simply notes that Defendant had abundant opportunity to give this training to Nation prior to 1981, at times when Nation was prima facie eligible for the training. He was already a manager of another department and had established a track record of being at least a good employee. Moreover, Sparks' statement that Nation was unwilling to take a pay cut in order to receive the training also is a nonexplanation. Although the Court credits Sparks' testimony that Winn-Dixie has a general policy requiring a department manager who elects to receive clerical training in another department to take a pay cut while in training, it also notes that the record abundantly reflects Defendant's willingness to permit its retail store supervisors to overlook such technicalities when they want to. The Court has no doubt but that Sparks could have permitted Nation to receive produce training without taking a pay cut, by the simple expedient of directing that it be done.

The Court credits Sparks' testimony to the effect that early in Nation's career, he had some minor difficulties. For example, Sparks testified that on one or more occasions, Nation did not complete stocking assignments promptly. However, taking into account Sparks' admissions that Nation was basically a good employee, and Nation's established record of achievement with Winn-Dixie, the Court concludes that the difficulties cited are insignificant and are not the real reason for Nation's slow progress.

Sparks further testified that after Nation was made junior assistant manager at the Douglasville store in 1976, Nation requested a demotion and transfer to a dairy/frozen food manager's job at another store, citing as his reason too much pressure in the junior assistant's job. The evidence showed that Nation received the demotion and transfer, but Nation denied having requested it. Nation's testimony on this point is credited.

Sparks was asked why he had not given Nation produce training during the period 1976 through 1980. Sparks replied that each of the less senior white employees was "the right man for the job," or variations of that statement. Though he was asked to provide a specific reason for choosing individual whites over Nation, he stated no objective reasons.

During Defendants' case-in-chief, Sparks gave, with respect to each white employee, specific objective reasons why they were chosen for produce training instead of Nation. For example, he stated that James Bonner was punctual, required little supervision, and was on the college training program. However, even at this point he

made no comparative analysis between Bonner and Nation. He never testified that Nation needed more supervision or that he was not punctual.

On cross Sparks was pressed again by Plaintiffs' counsel as to the reason for choosing the various whites over Nation. It was pointed out to Sparks that he had testified at his deposition that Nation was a good employee, but that the other employees chosen were more aggressive, had more desire, or just seemed better for the job. It was pointed out that none of the detailed objective reasons brought up by Sparks at trial had been mentioned by him at the deposition. Sparks then reverted to the theme that the chosen individuals were more "aggressive," "had desire," "took pride in their work," and so forth. From this testimony the Court finds that the real reason Sparks elected the other individuals for training and promotion to produce manager was simply because of his subjective impression that they better fit the Winn-Dixie mold. Mr. Nation, who is soft-spoken, easy-going in demeanor, and of the black race, did not fit Sparks' stereotypical image of an upwardly mobile Winn-Dixie employee.

Two other findings reinforce the Court's conclusion that Winn-Dixie discriminated against Nation in not training and promoting him to produce manager earlier. The first is the fact that in 1976, Nation's white store manager at the Douglasville store, Sam Wilkes, stated to white employees James Bonner and Dennis Hallman that Nation was his best candidate for produce manager but that he could not be promoted because he was black and the customers would not accept him. Hallman denied having heard this statement, but the Court finds his testimony not credible. Bonner did not freely admit having heard the statement, but he ultimately indicated, albeit obliquely, that a statement of that general nature had been made in his presence. Nation testified that about the time the incident allegedly occurred, Bonner had related the subject conversation to him. Wilkes was not called to testify.

Secondly, Plaintiffs presented some statistical evidence which is relevant to Nation's claim. See Plaintiffs' Exhibits 133 and 134. This evidence shows that in the years 1978 and 1980, no blacks were employed in the Sparks territory in the following job classifications: assistant manager, junior assistant manager, market manager or produce manager. Only two black persons were employed in department manager positions in those years: one as dairy/frozen food manager and one as deli manager.[13] Also, the evidence indicates that Sparks has consistently failed to meet Winn-Dixie's internal affirmative action guidelines.

The Court finds the foregoing evidence provides abundant basis for concluding, by a preponderance of the evidence, that Winn-Dixie's failure to train and promote Plaintiff Troy Nation to produce manager during the period from 1976 through 1980 was on account of his race. Accordingly the Court does so find.

*Individual Claim of Shelvie Wesley*

Plaintiff Shelvie Wesley is a 26-year-old black male who was hired as a part-time employee in September 1976. He became full-time in July 1977. His EEOC charge

---

**13.** This statistical evidence is not, however, as conclusive as it initially appears. In the first place, the stores in the Sparks territory had very few black employees. In 1978 they had 14 black employees out of a total of 236 (5.9%). In 1980, they had 11 black employees out of a total of 263 (4.2%). These low percentages correspond rather closely to the percentage of blacks in the general population in the counties involved—Douglas (5.2%), Paulding (4.6%) and Cobb (4.4%) counties. Bureau of the Census, U.S. Department of Commerce, Pub. No. PC80-1-B12, 1980 Census of Population (Georgia), General Population Characteristics (1982). Also, it is noted that at other times apparently not covered by Plaintiffs' Exhibits 133 and 134, Mr. Sparks did promote a black, Johnny Pope, to produce manager. Therefore the Court finds there is a negative inference which may be drawn from the statistical data presented by Plaintiffs relating to Sparks' promotional track record, but it is not a strong inference.

filed March 26, 1980 complained of Winn-Dixie's failure to give him dairy/frozen food training. On April 17, 1980, Wesley was made a dairy/frozen food clerk and thereafter received the requested training. He has now completed clerical training in the grocery, dairy/frozen food and produce departments. Wesley has never held a department manager position, although he is eligible for such promotion by virtue of having completed clerical training.

The Court has some initial difficulty in isolating from the mass of testimony presented at trial exactly what acts of discrimination Wesley is complaining of, and what relief he feels he is entitled to. Neither Shelvie Wesley, nor Harry Walton, whose individual claim is discussed below, gave any testimony concerning promotions they felt they should have received, but which they did not receive. Each did, however, testify concerning various experiences they have had while in the employment of Winn-Dixie which they feel were discriminatory.

Wesley has worked at most times relevant in a Winn-Dixie territory which is located in urban sections of Fulton and DeKalb Counties. The supermarket locations are: Briarcliff Road, Candler Road, Moreland Avenue, North Decatur Road, North Druid Hills Road, and Piedmont Avenue.[14] Wesley's successive retail store supervisors in that territory were: Bill McGraw, Darryl Fitzgerald, and Carl Smith. Wesley worked from November 1978 to November 1979 in a supermarket in Tucker, Georgia.[15] That store is in another territory which was headed at relevant times by supervisor Rod Owens.

Wesley testified that he felt Winn-Dixie's failure to make him a full-time employee prior to July 1977 was discriminatory. However, the proof showed that only one employee reached full-time status at Wesley's store (Briarcliff Road) during the time interval between Wesley's date of hire and when he was made a full-time employee. That employee, Alonzo Heath, was black.

Wesley further contends two white employees received grocery training while on part-time status, while he did not receive grocery training until he became a full-time employee. The evidence in this regard showed, however, that the two employees in question—Kirk Peterson and Tim Maloof—only received brief cashier training while they were in part-time status and that the reason was that they were working as cashiers on an intermittent basis. Further, the evidence shows that Wesley himself began cashier training while he was in part-time status.

Wesley's next claim is that he was discriminatorily denied dairy/frozen food training in 1979. At that time he was working at the Tucker store in Rod Owens' territory. A dairy/frozen food training slot became available; however, a white employee, Mike Collins, was selected for it instead of Wesley.[16] At that time Collins was a stock clerk who had completed only grocery training. Wesley, on the other hand, had completed both grocery training and produce training. Further, Wesley was three years older and had one year seniority[17] over Collins. Wesley's hourly rate of pay at the time was $6.48; Collins' was $5.81.

On the other hand, Wesley's supervisors who testified concerning his merits versus

---

**14.** Prior to the summer of 1979, the Tucker store was a part of this territory. In 1980 the Stone Mountain store was added to the territory.

**15.** The store is located on Lawrenceville Highway and has sometimes been referred to by the parties as the Lawrenceville store.

**16.** Collins became a dairy frozen food manager on April 23, 1981, 15 months after completing

this training. The record is silent as to whether this promotion was planned when Collins was selected for the training.

**17.** The two men began work as part-time clerks at about the same time, but Wesley became a full-time employee a year ahead of Collins.

those of .Collins gave Collins the edge.[18] Tucker supermarket manager Larry Shaw described Collins as a "hustler," and a good worker. Supervisor Rod Owens, who had only been supervising that territory for four months at the time in question, cited Collins' punctuality, good attitude, desire, ability to get along with others and the fact that Collins took pride in his work. While the supervisors' testimony and Wesley's personnel file generally indicate that he was considered a good employee, Shaw pointed out that Wesley was sometimes tardy arriving at work. The tardiness problem, however, was not mentioned in the personnel file, from which the Court deduces it was not major. The Court further notes an entry in Wesley's personnel file made by then-supervisor Darryl Fitzgerald on March 7, 1979 "Slim is progressing well. Needs to improve speed." However, at trial Mr. Fitzgerald indicated that Wesley's performance in the produce department, where he was working at the time the dairy/frozen food training became available, had been quite good. Indeed, he noted with apparent approval that he felt Wesley had "found his niche in produce."

The evidence further showed that practically from the beginning of his tenure at Winn-Dixie, Wesley has sought advice from Winn-Dixie management concerning how to "move up" in the company. While he was working at the Briarcliff store (prior to the 1979 incident involving the dairy/frozen food training) retail supervisor McGraw told him that in order to become a department manager in a Winn-Dixie supermarket, he would first need to complete training in all departments. Dairy/frozen food training was the final training segment Wesley lacked in order to fulfill the requirements for promotion to department manager position as stated by supervisor McGraw.

The evidence further showed that on the average 5.8% of the Tucker supermarket's employees in 1979 were black. See Plaintiffs' Exhibits 152, 154, 161 and 162. In 1981, the percentage was 6.1%. In 1979, 4.5% of the store's full-time employees were black, and in 1980 the percentage was 4.8%. See Plaintiffs' Exhibit 112. However, the available work force[19] in the surrounding area is between 12 and 20% black, depending on how the relevant area is defined. Cf. Plaintiffs' Exhibits 116 and 117. Therefore, black persons were at least 50% underrepresented at this location during the period in question.

The question before the Court is whether Defendant's choice of Mr. Collins for the training slot over Mr. Wesley was based on intentional discrimination[20] against Mr. Wesley on account of his race.

---

18. Defendants did not seek to justify the choice of Collins on the basis of a need to retain Wesley's services in the produce department.

19. The term "available work force" is not defined in the record. It appears on various plaintiffs' exhibits which appear to have been obtained through discovery from defendants. It is obvious that the representation of blacks in the "available work force" is less than blacks' representation in the general population. The Court does not consider that the lack of evidence as to how the "available work force" figures were determined is problematic within the factual framework of the instant case.

20. A Title VII action may be based on either a theory of disparate impact or disparate treatment or both. See Eastland v. Tennessee Valley Authority, 704 F.2d 613 (11th Cir.1983).

Proof of discriminatory intent is essential to the latter. International Brotherhood of Teamsters v. U.S., 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–1855 n. 15, 52 L.Ed.2d 396 (1977), while in a disparate impact case the focus is on a facially neutral employment practice and the employer's intent is irrelevant. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

Plaintiffs have sought to challenge Winn-Dixie's promotional and training practices under a disparate impact model, on the theory that the discretionary use of subjective criteria by white supervisors has an adverse impact upon blacks' promotion and training opportunities, without regard to the employer's intent. The Eleventh Circuit has recently noted that the application of a disparate impact test to a case involving subjective promotion procedures is "troublesome". Eastland v. TVA, supra, despite some former Fifth Circuit precedent to the contrary.

For the reasons hereinafter explained, the Court determines that it was.

The Court begins by acknowledging that, considering the testimony and demeanor of Wesley's supervisors, there was no appearance of racial animus or ill will toward him. Further, there did not seem to be any lack of sincerity in their statements that Collins had a good attitude, had desire, took pride in his work, and so forth. The Court also finds that Wesley's work record was not unblemished. However, noting that Wesley had more experience than Collins, and further noting that he was basically a good employee, the Court finds that Mr. Collins and Mr. Wesley were reasonably comparable employees. In making this finding, the Court discounts considerably the testimony of Collins' and Wesley's superiors regarding their subjective perceptions of Mr. Collins' merits. The reasons for this discounting are three-fold. First, accurate analysis of the testimony is difficult because its meaning is dependent on the undisclosed personal frame of reference of each supervisor who testified. Second, such perceptions may not be free of racial bias. Third, such subjective criteria are so vague and indefinite as to make it almost impossible for a Title VII plaintiff to properly respond.

Having determined that Wesley and Collins were reasonably comparable employees at the time in question, the Court now factors in the statistical evidence mentioned above. As previously mentioned, the statistics indicate a substantial underrepresentation of blacks within the employment ranks at the Tucker supermarket beginning in 1979. No evidence in the record suggests an explanation for these statistics other than the territorial supervisor's preference for white employees. Thus, after factoring in the statistical evidence, the Court does find and conclude that Defendant's selection of Mike Collins for the 1979 training slot instead of Shelvie Wesley was intentional discrimination on account of Wesley's race.

Wesley's next claim is that he was again discriminatorily denied dairy/frozen food training in 1980. After he failed to get the training at the Tucker store which went to Mike Collins, he asked to be transferred to the urban Atlanta territory previously mentioned. Wesley was placed at his request at the Moreland Avenue store. His store manager was Robert Echols, a black man. His retail store supervisor was initially Darryl Fitzgerald; in January, 1980 Carl Smith relieved Fitzgerald as retail store supervisor for that territory. Smith was made aware of Wesley's continuing interest in dairy/frozen food training.

A vacancy occurred on March 20, 1980 when the dairy/frozen food clerk, James Kitchens, was transferred to another store to become a dairy/frozen food manager. Kitchens is a black employee. For a period of several weeks thereafter the dairy/frozen food clerk's position was filled on a

See *Rowe v. General Motors Corp.,* 457 F.2d 348 (5th Cir.1972); *Wade v. Mississippi Cooperative Extension Service,* 528 F.2d 508 (5th Cir.1976). In *Pouncy v. Prudential Insurance Co. of America,* 668 F.2d 795 (5th Cir.1982), the new Fifth Circuit rejected the application of the disparate impact model to an attack on the use of subjective evaluation criteria, and stated that disparate impact analysis applies only to a specific, discrete employment practice or procedure, such as an aptitude test or educational requirement, the impact of which on a protected class can objectively be measured. *See also* the Court's Order denying class certification in this case. *Nation v. Winn-Dixie Stores, Inc.,* 95 F.R.D. 82, 87 (N.D.Ga.1982).

For the reasons stated in this Court's Order denying class certification, *id.,* as well as for the reasons set forth in *Pouncy, supra* and *Eastland v. TVA, supra,* the Court finds that the disparate treatment approach, and not disparate impact, is appropriate for this case. Specifically, a disparate impact test does not limit its focus to the complained of subjective aspects of an employer's policies, but also may measure the impact of a variety of other factors. It is therefore impossible to tell under a disparate impact approach whether the alleged adverse impact is caused by an employer's use of subjective criteria or other factors which are not the subject of the litigation. Moreover, it is especially difficult in the context of promotions to formulate employer decision-making criteria that are completely free of subjectivity.

relief basis by Daryl Wright and Dan Jessup, white employees. Wright was a part-time stock clerk with little seniority; Jessup was a former dairy/frozen food manager who had just transferred to Atlanta from Florida.

On March 26, 1980, Wesley filed an EEOC charge based on alleged discriminatory failure to receive the position vacated by James Kitchens. On April 17, 1980, Wesley did receive the position and simultaneously received his dairy/frozen food training. Wesley's position is that Winn-Dixie discriminatorily denied him the training slot on account of his race, and then only gave it to him because he filed an EEOC charge.

■ The evidence showed that during the three-week hiatus during which the dairy/frozen food clerk position was held by the two white employees, the Moreland Avenue store was going through a "grand reopening." Winn-Dixie's position is that the delay in placing Wesley in the frozen food clerk's position and in beginning his training was justified by the particular business needs associated with the grand reopening, namely, the greater volume of business. At that particular time Wesley, an experienced produce clerk, was working in the produce department. The Court finds Defendants' explanation credible and does not find the delay in placing Wesley in the dairy/frozen food clerk position to have been discriminatory.

Wesley introduced evidence calculated to show that management in the McGraw/Fitzgerald/Smith territory held racially discriminatory attitudes. This evidence was the testimony of Jerome Lakes, a former black employee of Winn-Dixie who worked in the territory and filed an EEOC charge after quitting. Lakes testified concerning several incidents. First, he told of discrimination he experienced when initially applying to Winn-Dixie for employment. He talked to James Paprowski, store manager of the Briarcliff supermarket, concerning a clerical position which had been ad-

vertised. Lakes held a college degree from West Georgia College. Paprowski took Lakes' application and mentioned to him that the company had a college training program, which included fast track advancement for college graduates. Paprowski said Lakes should mention his eligibility for this program when he talked to retail store supervisor McGraw about the possibility of employment. Lakes did talk to McGraw and was hired by him. McGraw denied any recollection of hearing about Lakes' college degree at the time, but the Court credits Lakes' testimony to the contrary.

After Lakes was hired, his personnel records failed to reflect his status as a member of the college training program. After he had worked as a clerk at the Moreland Avenue store for several months at $3.90 per hour, he learned that a more recently hired white clerk, Allen Pitts, was making $4.20 per hour. When Lakes inquired of management concerning the reason for the discrepancy, he was told by the store manager that Pitts was on the college training program, whereas he was not. Lakes confronted supervisor McGraw with this discrepancy; McGraw's position was that he had been unaware that Lakes had been to college.

Lakes also gave testimony concerning an incident which occurred at the Briarcliff store, where he also worked before quitting. Lakes testified that the supermarket manager, James Paprowski, showed him racial literature which he referred to as a "nigger employment application." Paprowski testified credibly that he had not intended this remark in a serious vein. Lakes testified credibly that he had not found the comment humorous.

Statistical evidence in the record tends to diminish Wesley's claim that racial attitudes of management personnel in the McGraw/Fitzgerald/Smith territory adversely affected his progress. During the relevant time frame, the available work force in the territory was between 19 and

20% black. *See* Plaintiffs' Exhibits 126, 163 and 164. Winn-Dixie's employees within the McGraw/Fitzgerald/Smith territory were at least 20% black. *See* Plaintiffs' Exhibits 126, 131, 132, 163 and 164. The representation of black persons employed on a full time basis within this territory was comparable; 1978—19.5%; 1979—25.5%; 1980—23.3%. *See* Plaintiffs' Exhibit 112. The evidence further showed that in the year 1978 in this territory, 42% of the assistant store managers were black; 40% of the junior assistant managers were black. *See* Plaintiffs' Exhibit 131. There were no black produce managers or black dairy/frozen food managers in that territory in that year, however. *See* Plaintiffs' Exhibit 131. In 1980, 14.3% of the assistant store managers were black; 28.5% of the junior assistant managers were black; 28.5% of the produce managers and 28.5% of the dairy/frozen food managers were black. *See* Plaintiffs' Exhibit 132. This statistical evidence indicates to the Court that during the years 1978 through 1980, black employees made reasonable promotional progress within the department manager ranks in the McGraw/Fitzgerald/Smith territory. Therefore, although Mr. Lakes' testimony referred to above is credited, the Court is unable to find that these incidents had any likely relationship to Mr. Wesley's progress or lack thereof.[21]

Plaintiffs' counsel made the additional claim at closing argument that Wesley had been passed over for four specific promotional slots for which he was qualified. Wesley did not even identify these positions, much less claim that he was unfairly denied them, during his testimony; however, they are summarized here as follows: (1) Brad Roseberry's promotion to dairy/frozen food manager on March 20, 1980; (2) Gregg Martino's promotion to dairy/frozen food manager on March 16, 1978; (3) Don Robinson's promotion to junior assistant manager on July 23, 1979; (4) Warren Shephard's promotion to junior assistant manager on December 15, 1978.

The evidence shows that Roseberry was promoted to the manager's position three months before he completed dairy/frozen food training. Roseberry, like Wesley, had completed grocery and produce training at the time. But Roseberry had been a full-time employee since January 1975 and Wesley only since 1977 at the time of this promotion. And Roseberry had received unequivocal recommendations as a very good employee throughout his tenure with Winn-Dixie.

Martino was promoted in another territory by supervisor Owens at a time when Wesley was working under supervisor Fitzgerald. Wesley would not ordinarily have been considered for this job. Similarly, Robinson was promoted by Fitzgerald in July 1979 at a time when Wesley was working in Owens' territory.

Warren Shephard had completed grocery, dairy/frozen food and produce training at the time of his promotion. Wesley had completed grocery training and was in the middle of produce training at the Lawrenceville store. Wesley testified that he had asked to be transferred there in order to receive produce training. Shephard had been a full-time employee with a good record since 1974.

The Court finds that these facts do not support counsel's contention at closing argument.

### III. *Individual Claim of Harry Walton*

Plaintiff Walton is a 31-year old black male who became a full-time employee in February 1977. Walton graduated from high school in 1969 and had eight years of work experience, including four as an as-

---

**21.** The record is devoid of evidence, statistical or otherwise, that would show that black employees have been *delayed* in receiving training or promotions when compared to whites. The facts of Wesley's circumstances in conjunction with such evidence might support a finding of discrimination, but Wesley's testimony standing alone is not sufficient.

sistant manager of a pizza parlor, before joining Winn-Dixie.

Walton worked in the urban Atlanta territory assigned to supervisors McGraw, Fitzgerald and Smith from 1977 through 1980. During most of this time he was at the Moreland Avenue store.

Walton completed the sequence of grocery, dairy/frozen food, and produce training by April 1979.[22] He did not receive any training from January 1977 until October 1978, however, and contends he was discriminatorily denied such training while whites advanced. His testimony was much too general for the Court to conclude that this aspect of Walton's claim has any substance; the evidence was not specific as to what training various whites received or why Walton felt he should have received training instead.

Walton contends that, upon completing his training, he was intentionally prevented from advancing to a manager's job until after this lawsuit was filed.[23] He further alleges that, when he was finally promoted, he was harassed by white employees and in one instance was assaulted by a division staff merchandiser. Walton's testimony was vague and general, and his version of the alleged assault bordered on the preposterous and undermined the credibility of the rest of his testimony.

■ Like Wesley, Walton contends that he was discriminatorily denied the junior assistant manager job awarded to Warren Shephard in December 1978. Shephard had completed grocery, dairy and produce training at the time and had three years of seniority over Walton. Walton was in the middle of produce training. Walton produced no direct evidence of discrimination, and no inference of intentional discrimination arises out of these facts.

■ Walton testified that he was denied a position as relief produce manager at the Moreland Avenue store in 1979 when supervisor Fitzgerald assigned the position to a white employee from another store. But Walton also testified that he did serve as relief produce manager at Moreland Avenue and later at Briarcliff Road under supervisor Smith. The Court cannot infer discrimination under those circumstances from Fitzgerald's decision to assign a white employee in one instance.

■ Walton also contends that he was discriminatorily prevented from becoming a permanent produce manager. He did not identify any specific openings or white employees who received such promotions in his territory, however. And supervisor Smith gave uncontradicted testimony that no produce manager's vacancy occurred from the time Smith took over the territory in January 1980 until Walton was promoted to dairy/frozen food manager in September 1980.[24]

Walton became dairy/frozen food manager at the Stone Mountain store. He had filed EEOC charges in the spring of 1980 and this lawsuit commenced in August 1980. Walton contends he was "set up" to fail in retaliation for pursuing legal action. He does not dispute that his performance as manager was sub-par; he argues rather that it was a result of harassment and a deliberate plot to cause him to fail.

Walton alleges that he was promoted to a department that was too large for him to manage, and that harassment from white employees prevented him from doing an effective job. He suggests that his supervisors intended for him to fail as a manager and that his treatment, including his demotion, was retaliatory.

---

**22.** Walton alleged in testimony that he received his grocery certificate three or four months late and was thereby delayed in his other training. He presented no evidence, however, of intentional discrimination in this regard.

**23.** Walton filed EEOC charges in the spring of 1980. This lawsuit was filed in August 1980. Walton was promoted to dairy/frozen food manager in September 1980 but demoted to produce clerk in December 1980.

**24.** The first vacancy that did occur, at about the time of Walton's promotion, was awarded to a black employee.

At the Stone Mountain location Walton worked under a white assistant store manager and had two white employees working under him in his department. He testified that he was harassed by the assistant manager and made to do odd jobs outside his department and that the whites in his department would not obey his orders. This testimony was quite general and unconvincing.

■ Walton was demoted to produce clerk and transferred to the South DeKalb store in December 1980. This demotion was not discriminatory; it is clear that Walton did not perform adequately as dairy/frozen food manager. Finally, Walton testified that Melvin Reynolds, a white produce merchandiser, maliciously hit him on the back in December 1980 while Walton was working as a produce clerk. This testimony was not credible. The evidence shows that Reynolds merely greeted Walton with a pat on the back. Walton appeared to greatly exaggerate the incident in an attempt to enhance his claim. Reynolds' testimony is credited.

Walton testified that during the fall of 1980 an assistant manager at the Briarcliff Road store called him "boy," a racially derogatory remark. The Court credits Walton's testimony but finds that the remark was neither part of a pattern of harassment nor did it belie an intent, given all the evidence, by supervisors to delay Walton's advancement.

### IV. Section 1985 Conspiracy

■ Plaintiffs have alleged a conspiracy by Winn-Dixie officials under 42 U.S.C. § 1985. Section 1985(c) allows recovery for the deprivation of rights or privileges by a conspiracy of two or more persons. It has generally been held that a corporation and its employees cannot conspire with each other in violation of section 1985. *Whitten v. Petroleum Club of Lafayette*, 508 F.Supp. 765, 770–71 (W.D.La.1981); *Harris v. Warner-Lambert Co.*, 486 F.Supp. 125, 127 (N.D. Ga.1980); *Girard v. 94th & Fifth Avenue Corp.*, 530 F.2d 66 (2d Cir.1976), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976); *Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir.1972); *but see Hodgin v. Jefferson*, 447 F.Supp. 804 (D.Md.1978); *Dupree v. Hertz Corp.*, 419 F.Supp. 764 (E.D.Pa.1976). Defendants are entitled to judgment in their favor on this claim.

### V. Liability of the Parent Corporation

Defendants argue that Winn-Dixie Stores, Inc., the parent corporation, cannot be held liable in this case for the acts of employees of its subsidiary, the Winn-Dixie Atlanta division.

■ It is established that a parent corporation and its subsidiary can be jointly liable under Title VII. *Carter v. Shop Rite Foods, Inc.*, 470 F.Supp. 1150, 1159–60 (N.D. Tex.1979); *EEOC v. UpJohn Corp.*, 445 F.Supp. 635, 638–39 (N.D.Ga.1977) (Murphy J.). *See Baker v. Stuart Broadcasting Co.*, 560 F.2d 389 (8th Cir.1977). In *EEOC v. UpJohn*, the Court noted "two closely related bases" upon which a parent corporation's liability for the discriminatory acts of a subsidiary may be predicated:

First, there may be evidence that the two corporations were so closely related in their activities and management as to constitute an integrated enterprise....

The most appropriate and definitive method for a determination as to whether a consolidation of separate entities is warranted involves a utilization of the National Labor Relations Board's single employer standards. This quadripartite test entails proof of: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control....

The second basis upon which to establish the responsibility of [a parent] for acts of its subsidiary ... involves agency.

(citations omitted).

■ Plaintiffs produced insufficient evidence under either theory to hold the parent liable for discrimination by the Atlanta subsidiary. There was no evidence whatsoever regarding common ownership or management, and none to suggest that the sub-

sidiary in this case acted as the parent's agent. The only evidence of interrelationship was that the manuals used to train employees in the Atlanta division were prepared by Winn-Dixie Stores, Inc. in Jacksonville, Florida. Otherwise, Plaintiffs expressly disavowed any connection or involvement of corporate officials above the level of retail store supervisor with the personnel decisions at issue in this case. Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶ 9–11. Plaintiffs' proof was virtually the opposite of the "centralized control of labor relations" required to establish liability of a parent corporation under Title VII. *James v. Family Mart*, 496 F.Supp. 891 (N.D.Tex.1979).

Plaintiffs' claim against Winn-Dixie Stores, Inc., the parent corporation, therefore fails for lack of proof.

In conclusion, the Court finds that Winn-Dixie intentionally discriminated against Troy Nation beginning in 1976. The Court finds that Winn-Dixie intentionally discriminated against Wesley by selecting a white employee for training in 1979. The Court finds that Walton failed to prove his claim of intentional discrimination. The issue of appropriate relief will be determined at the later portion of this bifurcated proceeding, which will be held at 10:00 a.m. on July 25, 1983.