Cynthia P. **PORTERA, plaintiff,**

v.

**WINN DIXIE OF MONTGOMERY, INC., et al., defendant.**

**No. CIV. A. 97-A-158-N.**

United States District Court, M.D. Alabama, Northern Division.

March 10, 1998.

Wanda Devereaux, James Darrington Hamlett, Devereaux & Assoc., Montgomery, AL, for Plaintiff.

William F. Gardner, R. Taylor Abbot, Jr., Stacey L. McDuffa, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, AL, for Winn-Dixie.

Randall C. Morgan, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, AL, for Greg Williamson.

### MEMORANDUM OPINION

ALBRITTON, Chief Judge.

### I. INTRODUCTION

This matter is before the court on Motions for Summary Judgment filed on December 22, 1997, by all three defendants: Winn–Dixie Montgomery, Inc. ("WDM"), Winn–Dixie Stores, Inc. ("WDS"),[1] and Greg Williamson. Plaintiff Cynthia P. Portera filed this suit on February 11, 1997, seeking recovery against the defendants for sexual harassment. She sues under Title VII, and the state law theories of outrageous conduct;

wrongful intrusion (invasion of privacy); negligence (in hiring, supervising, and training); and assault and battery. The Plaintiff also filed an Amended Complaint adding a claim for retaliation under Title VII. On January 27, 1998, the Plaintiff filed a Motion for Oral Argument on Dispositive Motions.[2]

### II. SUMMARY JUDGMENT STANDARD.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.

If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991); *see also* Fed.R.Civ.P. 56(e). A dispute of material fact "is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant. *See Peppers v. Coates,* 887 F.2d 1493 (11th Cir.1989).

---

1. WDS's motion is technically a motion to dismiss, or in the alternative a motion for summary judgment.

2. The court finds that the parties' briefs adequately address the relevant issues so that oral argument is not necessary. Accordingly, the Plaintiff's Motion for Oral Argument is ORDERED DENIED.

### III. FACTS

In deciding a motion for summary judgment, the evidence presented by the nonmovant must be believed and all justifiable inferences must be drawn in his favor. *Anderson,* 477 U.S. at 255. The facts, as viewed in that light, are as follows.

The Plaintiff, Cynthia Portera, was a female employee of WDM in its Carter Hill Road Winn Dixie store from December 1991 to August 1995. While employed with WDM, the Plaintiff worked in various positions. In some of these positions, Plaintiff was supervised, at least in part, by Greg Williamson ("Williamson"). Stan Sims was the Store Manager of the Carter Hill Winn Dixie store. Stan Sims' supervisor was the District Manager, which was a position held by James McMillan ("McMillan") up until October 1994, and was held by David Forbus ("Forbus") after October 1994.

While the Plaintiff was employed at the Carter Hill Road Winn Dixie store, Williamson engaged in activities which included hugging the Plaintiff, making comments to her which she found offensive, and touching her in a manner which he testifies she found to be inappropriate. On June 5, 1995, the Plaintiff made a complaint to Stan Sims that she had been sexually harassed by Williamson.

On June 5, 1995, Stan Sims reported the complaint to the District Manager, Forbus. Security Manager, Lee Sims, was asked to investigate the Plaintiff's complaint. Lee Sims conducted an investigation consisting of interviews with the Plaintiff, Williamson, and other WDM employees. Williamson denied the Plaintiff's allegations. During his investigation, Lee Sims and Forbus met with the Plaintiff and disclosed the results of the investigation. At some point, the Plaintiff asked for a transfer which Forbus told her she could have. The Plaintiff subsequently informed WDM that she no longer wished to transfer.

Lee Sims continued his investigation, after his meeting with the Plaintiff and Forbus, by again interviewing Williamson, as well as former WDM employees and an outside vendor. During the second meeting between Lee Sims and Williamson, Williamson admitted to some of the Plaintiff's allegations. Lee Sims subsequently prepared a written report and recommended disciplinary action for Williamson. Williamson received a reprimand which was placed in his personnel file, was verbally counseled, was required to view a training videotape on sexual harassment, and was transferred to another store.

On August 2, 1995, the Plaintiff gave a handwritten resignation letter to the Assistant Manager in which she stated that she was resigning because the whole store knew about her complaint, that the only people who should have known were those who were questioned, and that those who were questioned should have been told not to discuss the matter with anyone. Stan Sims later called the Plaintiff to see if she wanted to return to work, but she stated that she did not want to return.

### IV. DISCUSSION

#### Jurisdiction over WDS

WDS has asked for dismissal or summary judgment in its favor on two basic grounds: (1) lack of jurisdiction, and (2) it is not an "employer" subject to suit under Title VII. As an alternative, if these arguments are not successful, WDS has adopted the arguments of WDM regarding the sufficiency of Plaintiff's case.

As a preliminary matter, it should be noted that jurisdiction is not acquired over WDS in Alabama merely because WDS owns a subsidiary which operates in Alabama. Where the "subsidiary's presence in the state is primarily for the purpose of carrying on its own business and the subsidiary has preserved some semblance of independence from the parent, jurisdiction over the parent may not be acquired on the basis of the local activities of the subsidiary." Wright & Miller, Fed.Prac. & Proc., Civil, 2d § 1069. Rather, in order to claim jurisdiction over the parent based on the activities of the subsidiary, the Plaintiff would have to show that WDM's existence was "formal only and without any semblance of individual identity," and that WDM was merely an agent of WDS. *Id.* This the Plaintiff has not attempted to

do, and indeed could not do given the evidence discussed below. Jurisdiction over WDS must be based, therefore, on its activities within Alabama.

In a case where there was no evidentiary hearing regarding jurisdiction, the Eleventh Circuit has held that the standard for decision is clear:

> [T]he plaintiff must establish a prima facie case of personal jurisdiction over a nonresident defendant. A prima facie case is established if the plaintiff presents enough evidence to withstand a motion for directed verdict. The district court must accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits. Finally, where the plaintiff's complaint and the defendant's affidavits [or depositions] conflict, the district court must construe all reasonable inferences in favor of the plaintiff.

*United States Sec. & Exch. Comm'n v. Carrillo,* 115 F.3d 1540, 1542 (11th Cir.1997), quoting *Madara v. Hall,* 916 F.2d 1510, 1514 (11th Cir.1990). In this case, evidence has been presented by both sides. Therefore, the court must decide the issue as it would a motion for directed verdict, by looking to see whether there could be but "one reasonable conclusion" given the evidence. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1370 (11th Cir.1997) (noting that the standard for directed verdict "mirrors" that for summary judgment).

■ In deciding whether there is personal jurisdiction, the court looks to (1) whether jurisdiction could be found under the state's long-arm statute, and (2) whether that finding would comport with due process. *Madara,* 916 F.2d at 1514. In this case, that analysis conflates into a single step. The limits of Alabama's long-arm jurisdiction are coextensive with the limits of due process. *Ex parte MONY Fed. Credit Union,* 668 So.2d 552, 556 (Ala.1995). Exercising personal jurisdiction over a defendant is within the bounds of "due process when '(1) the nonresident defendant has purposefully established minimum contacts with the form ... and (2) the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice.'" *Carrillo,* 115 F.3d at

1542, quoting *Francosteel Corp. v. M/V Charm,* 19 F.3d 624, 627 (11th Cir.1994).

Basically, a forum may exercise jurisdiction in two sets of circumstances. One, the forum may exercise "specific jurisdiction" over a "defendant in a suit arising out of or related to the defendant's contacts with the forum." *Carrillo,* 115 F.3d at 1542 n. 2, quoting *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404. Two, the forum may exercise "general jurisdiction ... over a defendant in a suit not arising out of or related to the defendant's contacts with the forum." *Carrillo,* 115 F.3d at 1542 n. 2, quoting *Helicopteros,* 466 U.S. at 414 n. 9. In the present suit, Plaintiff has not specified the type of jurisdiction sought. Nevertheless, jurisdiction fails under either theory.

■ Specific jurisdiction cannot be established because WDS has done nothing which links it to the facts of this suit. WDS is merely a parent company of WDM; one which has almost no contact with Alabama. As the relationship was described in a sworn statement:

> Winn–Dixie Stores, Inc. ("WDS") is a parent company of Winn–Dixie Montgomery, Inc....
>
> WDS is not licensed to do business in Alabama and does not do business in Alabama. WDS has no agent for service of process in Alabama. WDS owns no property, real or personal, in Alabama. WDS has no office, facility, or store in Alabama. WDS maintains no bank accounts in Alabama, has no telephone listing in Alabama, and has not entered any contracts in Alabama.

WDM's Answer to Int. # 1 (Oct. 29, 1997).

In order to find contacts sufficient for specific jurisdiction, the court should look to three factors: (1) the relationship between the contacts and the cause of action, (2) the degree to which the defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum," and (3) the degree to which the defendant could "reasonably anticipate being haled into court" in the jurisdiction. *Carrillo,* 115 F.3d at 1542, quoting *Vermeulen v. Renault, U.S.A., Inc.,*

985 F.2d 1534, 1546 (11th Cir.1993). In the present case, Plaintiff has linked Defendant to only one activity which has any relation to this cause of action. WDS prepared some "general personnel guidelines" which WDM could choose, or not choose, to enact. *See* WDM's Answer to Int. #1 (Oct. 29, 1997). Other than that, the Plaintiff is unable to show any link of WDS with the facts of this case. Indeed, the evidence is uncontested as to the lack of connection. As explained by the Defendant:

> WDM has a Human Resources Department located in Montgomery, Alabama. The Human Resources Manager of WDM, William C. Walters, is supervised by and answers to the President of WDM, who is also located in Montgomery. WDS does not supervise or manage the WDM Human Resources Department. WDS does not make employment decisions regarding WDM employees. WDS did not participate in any decision concerning the plaintiff in this case. WDS does not review or approve decisions made by WDM regarding terms and conditions of employment of WDM employees. WDM maintains the personnel files of its employees.
>
> WDS formulates general personnel guidelines which are provided to WDM. WDM decides whether to implement such guidelines. To the extent they are implemented, personnel policies are implemented and administered by the human resources staff and management of WDM. There is no centralized office at WDS to oversee employment practices at WDS.

WDM's Answer to Int. #1 (Oct. 29, 1997).

Use by WDM of a handbook developed by WDS would not be evidence of such activity to find jurisdiction over WDS in Alabama. Indeed, WDM made the decision to use the book, which strikes this court as a unilateral decision. The Supreme Court has held that "unilateral activity of another party or a third person is not an appropriate consideration when determining whether the defendant has sufficient contacts with a forum

State to justify an assertion of jurisdiction." *Helicopteros,* 466 U.S. at 417. Indeed, even to the extent that this may be a contact with Alabama, it is not the sort of purposeful availment of Alabama laws which would lead a defendant to reasonably expect suit here. Nor would it comport with fair play and substantial justice. *See Johnston v. Frank E. Basil, Inc.,* 802 F.2d 418 (11th Cir.1986) (holding that advertising for employees in Alabama and employing Alabama resident in another jurisdiction would not allow Alabama jurisdiction over out-of-state employer who: was not licensed to do business in Alabama, had no addresses or telephones in Alabama, had no accounts in Alabama or income from Alabama, and owned no real property in Alabama).

▇ The Plaintiff has not rested her argument solely on the employee policies, however. The Plaintiff has also presented evidence of one common manager (the head of WDM is also an employee of WDS) and evidence that WDS may have done some business in Alabama (in the form of UCC filings). Employment of the WDM head or the UCC filings[3] might be enough to establish specific jurisdiction against WDS. In other words, jurisdiction might be exercised over WDS "in a suit arising out of or related to" these particular contacts with Alabama. *Carrillo,* 115 F.3d at 1542 n. 2, quoting *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

Nevertheless, the UCC filings, which evidence contacts regarding some transactions in computers, is not sufficient to establish general jurisdiction over WDS related to an employment dispute, even when coupled with the other alleged activities of WDS in Alabama. In order for a state to exercise a general jurisdiction over a defendant, i.e. jurisdiction "in a suit not arising out of or related to the defendant's contacts with the forum," *Helicopteros,* 466 U.S. at 414 n. 9, the defendant must be engaging in "continu-

---

**3.** The court is assuming for the sake of argument that the UCC filings are admissible, or should be considered by this court at this stage. The documents are not authenticated and the Defendant has filed a Motion to Strike them from the court's consideration. Since the court would decide that there is no jurisdiction even with consideration of these documents, the court need not decide this motion. The Motion to Strike is ORDERED DENIED as moot.

ous and systematic general business contacts" in the jurisdiction, *Id.* at 416. WDS has not conducted anything that rises to that level. WDS has, at best, owned a subsidiary in Alabama, employed someone who is also employed by the subsidiary, and furnished some materials to the subsidiary. These are not sufficient contacts for general jurisdiction. *See id.* at 416–18 (rejecting general jurisdiction in Texas where defendant's CEO had made business trip to Texas for negotiation, and defendant had accepted checks from Texas bank, make purchases in Texas, and received training in Texas); *Madara,* 916 F.2d at 1516 n. 7 (holding that "[i]ndirect ownership of property, concert performances and the sale of records and the like" are not sufficient for general jurisdiction); *Borg–Warner Acceptance Corp. v. Lovett & Tharpe, Inc.,* 786 F.2d 1055, 1057 (11th Cir. 1986) (no general Missouri jurisdiction over Georgia corporation whose only contact with Missouri was to purchase goods on one occasion from Missouri corporation).

### *WDS as Plaintiff's Employer*

█ Even if the court were not to grant summary judgment to WDS on the basis of lack of jurisdiction, the court would still be inclined to grant summary judgment in WDS's favor on the Title VII counts, since WDS is not the Plaintiff's employer. In 1983, the United States District Court for the Northern District of Georgia had occasion to analyze the liability of Winn–Dixie Stores in a bench trial in which Winn–Dixie Atlanta, Inc. (the Georgia mirror of Winn–Dixie Montgomery), was found liable for racial discrimination in its treatment of two employees. *Nation v. Winn–Dixie Stores, Inc.,* 567 F.Supp. 997 (N.D.Ga.1983). The court analyzed WDS's potential liability on two theories (1) agency, and (2) integrated enterprise (looking to "(1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control"). *Id.* at 1010; *see also Lyes v. City of Riviera Beach,* 126 F.3d 1380 (11th Cir.1997) (applying following factors: (1) the interrelation of operations, (2) centralized control of labor relations, (3) common management, (4) *common ownership or financial control*). The court held that there

was insufficient evidence to find WDS liable under either theory.

As the court explained, there was still "no evidence whatsoever regarding common ownership or management; and none to suggest that the subsidiary in this case acted as the parent's agent." *Id.* at 1010–11. In addition, evidence that "the manuals used to train employees" were produced by WDS was also not sufficient. *Id.* at 1011. The court also found important the lack of "any connection or involvement of corporate officials above the level of retail store supervisor with the personnel decisions at issue in this case." *Id.*

WDS has presented evidence in this case of a present relationship between WDM and WDS which parallels that between Winn–Dixie Atlanta and WDS. The only connections are some common managers (not related to personnel decisions or this case), and the production of manuals by WDS which WDM *may* elect to use:

The interrelation between WDS and WDM is that WDM is a wholly-owned subsidiary of WDS. The President of WDM is also an employee of WDS. WDM is incorporated under the laws of the State of Kentucky, and has its principle place of business in Montgomery, Alabama. All of the stock of WDM is owned by WDS. WDM operates independently of WDS. WDM has a separate corporate headquarters. WDM maintains its own bank accounts. WDM files it own separate State tax returns. WDM does not show authority regarding business decisions with WDS. Decisions regarding the operation of WDM are made by WDM management.

WDM has a Human Resources Department located in Montgomery, Alabama. The Human Resources Manager of WDM, William C. Walters, is supervised by and answers to the President of WDM, who is also located in Montgomery. WDS does not supervise or manage the WDM Human Resources Department. WDS does not make employment decisions regarding WDM employees. WDS did not participate in any decision concerning the plaintiff in this case. WDS does not review or approve decisions made by WDM regarding terms and conditions of employment of

WDM employees. WDM maintains the personnel files of its employees.

WDS formulates general personnel guidelines which are provided to WDM. WDM decides whether to implement such guidelines. To the extent they are implemented, personnel policies are implemented and administered by the human resources staff and management of WDM. There is no centralized office at WDS to oversee employment practices at WDS.

WDM's Answer to Int. #1 (Oct. 29, 1997). The Plaintiff has not provided proof of any closer relationship. The Plaintiff's arguments are, in fact, based on the evidence presented by WDM. This evidence cannot prove liability of WDS for the personnel actions of WDM, as was the issue in *Nation*. Indeed, given that there is even clearer evidence of the lack of interrelation between the corporations, the court cannot even find that the Plaintiff has presented a case sufficient to withstand summary judgment. Therefore, the Motion of WDS will be granted. The court will next examine the merits of the Plaintiff's claims as asserted against WDM and Williamson.

### Title VII Claims.

■ The Plaintiff has named Williamson and WDM as defendants in her Title VII claims. As the Plaintiff acknowledges, because the Eleventh Circuit does not recognize claims against individuals under Title VII, Williamson is entitled to summary judgment on the Title VII claims. *See Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991). Therefore, the court will focus on the Title VII claims brought against WDM.

### Title VII Claim for Hostile Environment

Title VII prohibits an employer from discriminating against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Hostile environment harassment is said to occur "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently sever or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

The Plaintiff has argued that she has provided sufficient evidence to establish that she was subjected to an objectively hostile environment, which she also subjectively perceived as creating an abusive working environment. WDM has not moved for summary judgment on the basis of the Plaintiff's ability to establish that there was a hostile environment, but has instead argued that WDM cannot be subjected to liability for the hostile environment, because it did not have notice of the hostile environment, and because it adequately remedied the situation when it did have notice.

■ The court will first address the argument that WDM remedied the hostile environment once it received notice. The court notes that there appears to be no dispute that WDM had actual notice of the alleged hostile environment on June 5, 1995, when the Plaintiff made her complaint to Stan Sims.

WDM has argued that no liability can attach based on this complaint because WDM promptly and adequately remedied the harassment once it was the complaint was made. WDM states that the Plaintiff complained on June 5 and that by June 15, Williamson had been transferred to another store, verbally counseled, and was told to undergo additional training including a sexual harassment training videotape. David Forbus Affidavit ¶ 5.

In addition to evidence of its remedial efforts, WDM also provides evidence of the investigation that Lee Sims conducted of the Plaintiff's complaint. Lee Sims met with the Plaintiff the day after she made her complaint. Lee Sims Affidavit, ¶ 5. Lee Sims also interviewed Williamson, who denied the allegations, and interviewed and took statements from several co-employees and one outside vendor. *Id.* at ¶ 7. Lee Sims and Forbus subsequently met with the Plaintiff. Id. at ¶ 5. When asked what she would like WDM to do about her complaint of Williamson's conduct, the Plaintiff requested a trans-

fer. Portera's Deposition, page 145. Portera subsequently changed her mind about the transfer. Lee Sims completed his investigation by interviewing former female employees and a former district manager. *Id.* at ¶ 9. In a second meeting between Lee Sims and Williamson, Williamson admitted to some of the conduct alleged by the Plaintiff. *Id.* ¶ 10, Exhibit E. Lee Sims then prepared a written Investigative Report and recommended disciplinary action for Williamson. Id. at ¶ 10.

As a result of Lee Sims' investigation and recommendation, a reprimand was placed in Williamson's file which stated that any future occurrences will result in his termination from the company. Forbus Affidavit, Exhibit A. Williamson was verbally counseled, had to watch a training videotape on the subject of sexual harassment, and was transferred to another store location. Forbus Affidavit, ¶ 5. WDM points out that the Plaintiff has stated in her deposition that after the transfer of Williamson, the sexual harassment stopped. Portera's Deposition, page 196.

In *Farley v. American Cast Iron Pipe Co.,* 115 F.3d 1548 (11th Cir.1997), the Eleventh Circuit analyzed a retaliation claim based on the theory that the employer retaliated against an employee by failing to take prompt remedial action after the employee complained of sexual harassment. In analyzing this claim, the Eleventh Circuit gave some guidance as to what constitutes prompt remedial action within the context of a complaint of sexual harassment. The court explained that the employer immediately initiated an investigation, conducted extensive and thorough interviews with members of the staff, prepared a report detailing the results of the investigation, sanctioned the harassing employee by reprimanding him in writing, demoted the employee by taking away supervisory responsibility and reducing his pay and benefits, and made strenuous efforts to relocate the complaining employee. *Farley,* 115 F.3d at 1555. WDM argues that its actions mirror that of the employer in *Farley.*

The Plaintiff, on the other hand, has argued that WDM failed to take appropriate remedial action. The Plaintiff argues that the offer to transfer her to another store was not an adequate response, because it was punishing the Plaintiff rather than the harasser. WDM responds by presenting evidence that the Plaintiff originally asked for a transfer and initially agreed to a transfer. Regardless of where the idea for a transfer originated, the mere fact that the employer sought to transfer the Plaintiff rather than Williamson, but ultimately transferred Williamson, does not establish that WDM failed to take prompt remedial action. *See Bennett v. CompUSA, Inc.,* NO. 3:96–CV–0742–P, 1997 WL 10028, at *7 (N.D.Tex. Jan.7, 1997) ("case law indicates that as long as the complainant does not suffer ill effects with regard to salary or benefits, a transfer of the complainant can constitute an appropriate means of handling a sexual harassment claim.")

The Plaintiff also argues, however, that WDM's discipline of Williamson was not an adequate remedial measure. The Plaintiff states that the counseling of Williamson had no effect because he could not articulate the sexual harassment policy. The Plaintiff also argues that the transfer was not punishment, and that Williamson received no reduction in pay or benefit. Finally, the Plaintiff states that the threat to terminate Williamson which was placed in his personnel file was meaningless given that the WDM policy that unwanted touching should result in termination.

First, the court notes that the WDM policy provided by the Plaintiff to the court does not state that unwanted touching should result in termination, but instead states that any associate who has been found to have sexually harassed any other associate or visitor "will be subject to disciplinary action up to and including termination." Plaintiff's Exhibits 1 and 3. Therefore, the mere fact that Williamson was not terminated does not indicate that there was a lack of prompt remedial action, especially given that the evidence establishes that he was reprimanded.

The Plaintiff's argument appears to be that Williamson was not adequately punished for the harassment in which he allegedly engaged. However, the Eleventh Circuit has held that the standard for whether or not

remedial actions are appropriate is whether the remedy is "reasonably likely to prevent the misconduct from recurring." *Reynolds v. CSX Transportation*, 115 F.3d 860, 868 (11th Cir.1997). In *Reynolds*, the employer's remedial actions included a demotion, warning, transfer, and an order to attend sensitivity training. The Eleventh Circuit found it significant in *Reynolds* that the plaintiff testified that after the employer took action against the harassing employee, he never said anything to her or touched her inappropriately. *Id.* at 868.

Similarly, in this case, the Plaintiff has testified that she was not subjected to sexual harassment after Williamson was transferred. Portera's Deposition, page 196. Therefore, as in *Reynolds*, a reasonable juror could not find that the actions taken by WDM did not constitute prompt remedial action reasonably likely to prevent the misconduct from recurring. *See also Goodstein v. Gunther Motor Co.*, No. 95–6678, 1996 WL 903950 at *11 (S.D.Fla.1996) (finding that plaintiff's contention that remedial actions were insufficient because employer did not discipline employee were baseless given that after she complained the employee never touched her again and stopped making inappropriate remarks). Merely because the Plaintiff may feel that other punishment may have been appropriate does not mean that the employer's remedial actions were inadequate. It is not the role of this court to determine if an offending employee was disciplined in a manner which the Plaintiff feels is appropriate, but to determine whether remedial efforts were adequate. *See Knabe v. Boury Corp.*, 114 F.3d 407, 414 (3rd Cir.1997) (stating that "punitive action against the harassing employee, e.g., reprimand, suspension or dismissal, is not necessary to insulate the employer from liability ... [s]o long as the remedy is reasonably calculated to prevent future instances of harassment ...."), *see also Goodstein*, 1996 WL 903950 at *11 ("it is not enough for the plaintiff merely to point out ways in which she thinks the remedial actions could have been better or to point out how the remedial expectations did not meet her expectations"). In light of the Plaintiff's own testimony that she was no longer subjected to sexual harassment by Williamson after he was transferred, the *Reynolds* standard of "reasonably likely to prevent the misconduct from recurring" has been met.

Because the Plaintiff has failed to create a question of fact as to the promptness of WDM's investigation and the adequacy of its remedial measures once the Plaintiff made a complaint, to establish liability on the part of WDM for a hostile working environment, the Plaintiff must establish that WDM knew or should have known of the hostile environment before she made her complaint on June 5. *See Reynolds*, 115 F.3d at 867 (analyzing claim that remedial action was not promptly taken before complaint was made by determining if there was constructive knowledge prior to the complaint). To this end, the Plaintiff has argued that WDM should be held liable for the hostile environment which she claims was created by Williamson.

The Eleventh Circuit has explained the legal principles which give rise to liability of an employer for acts of its agent which create a hostile work environment. *Faragher v. City of Boca Raton*, 111 F.3d 1530 (11th Cir.1997) (*en banc*). Within this structure, built on agency principles, there are two types of liability; direct and indirect. "An employer is directly liable for hostile environment sexual harassment if it knew, or upon reasonably diligent inquiry should have known, of the harassment and failed to take immediate and corrective action." *Id.* at 1535. Indirect liability lies "(1) when a harasser is acting within the scope of his employment in perpetrating the harassment; and (2) when a harasser is acting outside the scope of his employment, but is aided in accomplishing the harassment by the existence of agency relationship." *Id.* at 1536 (omitting internal citations). Principles of indirect liability may apply in this case since Williamson, the purported harasser, served as the Plaintiff's supervisor for at least of portion of the time period in question.

*Indirect Liability*

█ The Defendants have moved for summary judgment on the basis of indirect liability stating that Williamson was acting outside of the scope of his employment when he

engaged in the activities which allegedly created a hostile environment. The Defendants rely in large part on *Faragher v. City of Boca Raton*, 111 F.3d 1530 (11th Cir.1997) (*en banc*). The Plaintiff argues in response that this court should not follow *Faragher* because the United States Supreme Court has granted a writ of certiorari in that case.

In support of her argument with regard to the precedential value of *Faragher*, the Plaintiff has cited *Gaines v. Dougherty County Board of Education, et al.*, 329 F.2d 823 (5th Cir.1964). However, the court in *Gaines* was an appeals court concerned with another appeals court decision, and the court did not address a district court's duty in following precedent of the appeals court. The Plaintiff has cited no binding or persuasive authority which would cause this court to conclude that it should depart from the general rule that "cases are to be decided in accordance with the law existing at the time of decision." *Jones v. Preuit & Mauldin*, 876 F.2d 1480, 1482 (11th Cir.1989). This court must, therefore, follow *Faragher* unless and until it no longer is binding precedent in this circuit.

In *Faragher*, the Eleventh Circuit made it clear that an employer cannot be held strictly liable for harassment perpetrated by a supervisor. *Faragher*, 111 F.3d at 1536. Instead, the court explained that an employer can be held indirectly liable if the agent of the employer, a supervisor, used harassment as a way of accomplishing an authorized purpose. *Id.* at 1537. In *Faragher*, the harassment at issue consisted of offensive comments, gestures, and touching. *Id.* The court explained that there was no evidence that the harassment occurred in order to perform any service for the employer or that the harassing employees were authorized to engage in such harassment. *Id.* Similarly, in this case, no evidence has been presented which would establish that any acts of harassment by Williamson occurred in order to perform a service for WDM. Therefore, the court concludes that the Plaintiff has failed to create a question of fact as to whether Williamson was acting within the scope or his employment by perpetrating harassment.

The Eleventh Circuit also explained in *Faragher* that a supervisor, acting outside the scope of his employment, is not aided in accomplishing harassment merely because the supervisor is required to have close and regular contact with an employee. *Id.* at 1537. The court explained that there was no evidence that the harasser used the authority delegated to him, for example, by reminding the victim that he could fire her. *Id.* Similarly, in this case, there is no evidence that Williamson told the Plaintiff that he could fire her, nor any evidence that he used any authority delegated to him in perpetrating acts of harassment. Therefore, the court concludes that WDM cannot be held indirectly liable for Williamson's harassment, even if the hostile environment was created while Williamson served as the Plaintiff's supervisor.

*Direct Liability*

■ There are two methods by which the Plaintiff can establish direct liability of WDM for creation of a hostile environment by a supervisor or co-employee: (1) she can show that she complained to higher management without the harassment, or (2) she can demonstrate that the harassment was so severe and pervasive that an inference of constructive knowledge can arise. *See Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900 (11th Cir.1988). If the Plaintiff seeks to show that there was constructive knowledge of a hostile environment, she must show that the "harassment was so pervasive as to infer constructive knowledge on the part of higher management." *Reynolds v. CSX Transp., Inc.*, 115 F.3d 860 (11th Cir.1997).

The Plaintiff does not contend that she made any complaints prior to June 5. The Plaintiff instead has argued that WDM may be held directly liable for hostile environment sexual harassment because it knew or should have known of the hostile environment. WDM argues in response that there is no evidence the District Managers, either Forbus or McMillan, had knowledge of the harassment. WDM points to the Plaintiff's deposition testimony that the District Managers, who visited the store once or twice a week on average, did not witness any offen-

sive conduct, and that the Plaintiff did not complain to them when they visited the store.

The Plaintiff first argues that, contrary to WDM's contentions, there is evidence that WDM had actual knowledge of a hostile environment. In her brief, the Plaintiff states that Stan Sims was present during some of Williamson's comments and that Stan Sims referred to the Plaintiff as "Williamson's stuff." The court has carefully reviewed the evidence cited by the Plaintiff to determine if she has provided sufficient evidence of actual knowledge on the part of Stan Sims. In her deposition, the Plaintiff says that it is "possible" that Stan Sims was present during two comments which were made by Williamson, but that she does not specifically recall Stan Sims being present when Williamson made the comments. Portera Deposition, pages 104, 106. The court finds that this testimony does not establish that Stan Sims had actual knowledge of these comments, or of alleged sexual harassment. Even drawing all inferences in favor of the Plaintiff, the court cannot conclude that the Plaintiff's testimony that Stan Sims referred to her as "Williamson's stuff" is evidence that he had actual knowledge of sexual harassment. It may be that Stan Sims' statement is some evidence that he thought there was a sexual relationship, but it is not probative evidence that Stan Sims actually knew that Williamson had sexually harassed the Plaintiff.

The Plaintiff also argues that Williamson had actual knowledge of sexual harassment. Although this argument is not a foregone conclusion, since the Plaintiff has not offered evidence that she told Williamson that she felt she was being sexually harassed, as there is evidence that Williamson perceived the Plaintiff as acting shocked or surprised at his conduct on two occasions, the court concludes that there is enough evidence to establish for summary judgment purposes that Williamson had knowledge.

The Plaintiff argues that because Williamson had knowledge, his knowledge can be imputed to WDM. The Plaintiff also argues that Stan Sims had constructive knowledge of a hostile environment and this knowledge should be imputed to WDM. Both of these arguments hinge upon the Plaintiff's theory

that Williamson's and Stan Sims' knowledge must be considered to be the knowledge of WDM, because Stan Sims and Williamson were "upper management." WDM responds that knowledge of neither Williamson or Stan Sims can be imputed to WDM, because neither Williamson nor Stan Sims may be considered "upper management" for purposes of attributing knowledge. According to WDM, although Williamson and Stan Sims may have been considered to have been a type of management level employees, they are not upper management and, therefore, their knowledge cannot be considered to be the knowledge of WDM.

The Plaintiff explains that Stan Sims should be considered to be upper management because Stan Sims held the position of "location manager" which, along with department manager, is a position to which employees are supposed to report sexual harassment under the sexual harassment policy adopted by WDM. The Plaintiff also offers evidence that Williamson has been a location manager and a department manager during the period in which he allegedly created a hostile working environment for the Plaintiff. In other words, the Plaintiff seeks to impute knowledge to WDM based on the fact that the person who allegedly harassed her, and the person whom she asserts should have been aware of the harassment, were persons to whom complaints of discrimination could be made under the WDM's policy. The Plaintiff's theory is that WDM should be held to have the same knowledge as persons to whom sexual harassment complaints could be made, regardless of their status or level of responsibility with the employer.

WDM responds that the Plaintiff has cited no authority for the proposition that being at the low end of a hierarchical chain for reporting grievances makes an employer "higher management." WDM argues that it would stand to reason that no authority for this proposition exists since it is common for all grievance procedures to designate an employee's immediate supervisor as the first person to whom a complaint should be made.

The court has carefully considered the Plaintiff's theory in light of Eleventh Circuit precedent which has discussed agency princi-

ples within the context of a hostile environment claim, and has found that the Eleventh Circuit has had the opportunity to adopt the Plaintiff's theory, but has not done so. *See Faragher*, 111 F.3d at 1533.[4] The facts in *Faragher* were similar to the facts in this case in that a person who was in charge of giving oral reprimands and placing reports of disciplinary actions in personnel files was the person who engaged in acts of sexual harassment, and also was apparently aware, or should have been aware, of another person's acts of sexual harassment. *Id.* at 1533. In other words, as in the instant case, a person with actual and/or constructive knowledge of the harassment was also a person who was responsible for personnel matters. Rather than rely on this "manager's" status, however, the Eleventh Circuit held that even if the acts of harassment were sufficiently severe and pervasive to constitute a hostile environment, there was no evidence that the remote employer knew or should have known of the harassment. *Id.* at 1537. Had the Eleventh Circuit chosen to do so, it could have imputed knowledge based upon the fact that the person in charge of disciplinary actions was engaged in or should have known of sexual harassment. Instead of imputing knowledge, the Eleventh Circuit required evidence that higher managers had knowledge of the hostile environment.

Even though the Eleventh Circuit did not expressly reject the argument made by the Plaintiff in this case, this court finds that *Faragher* is still instructive in this case given that there were facts under which the Eleventh Circuit could have adopted this theory, and given that this theory was considered and adopted by at least some of the judges. For instance, Judge Tjoflat stated that the majority's use of "knew or should have known" means that if a trier of fact could "conclude from the evidence that the agent responsible for ensuring order in the workplace (including the prevention of severe and pervasive sexual harassment) knew that the employee was being subject to a hostile environment, that knowledge would constitute the employer's knowledge." *Faragher*, 111 F.3d at 1545 n. 1 (Tjoflat, J., concurring in part and dissenting in part). Judge Tjoflat stated that because the person whom he concluded had the responsibility of correcting sexual harassment was aware of the sexually abusive environment and did nothing about it, he would hold the employer liable. *Id.* at 1546. This was not, however, the analysis adopted by the majority. This court is bound to apply the analysis required by the Eleventh Circuit in *Faragher*, unless and until that analysis is overruled by the Supreme Court, or changed by a subsequent *en banc* decision.

Under the *Faragher* analysis, this court must determine if the alleged conduct was sufficiently severe and pervasive so that WDM higher management knew or should have known of the allegedly hostile environment. In conducting this analysis, this court must bear in mind that merely because conduct is sufficiently severe and pervasive to create a hostile environment does not necessarily mean that the conduct is sufficiently severe and pervasive to charge an employer with knowledge of the conduct. *Faragher*, 111 F.3d at 1538. This court must evaluate the totality of the circumstances in determining whether the conduct was pervasive enough to put the employer on notice. *Id.*

---

4. The court also notes that in *Reynolds v. CSX Transportation, Inc.*, 115 F.3d 860 (11th Cir. 1997), the Eleventh Circuit addressed an argument based on actual knowledge in the form of reported comments to a manager of the employer. The Eleventh Circuit found that knowledge of the manager could not be imputed to the employer because there was no evidence that the manager was considered to be higher management by the employer, or that the manager had a duty to report to higher management the type of comment which was reported. *Id.* at 867. To the extent that the Eleventh Circuit intended to acknowledge a theory of liability based on a manager's duty to report under the sexual harassment policy, the court finds that the facts in this case do not fall within that theory, since there was no report of harassment or comments made to a person with a duty to report before June 5. If *Reynolds* were not limited to facts in which there was an actual report, but were extended to facts where there was alleged constructive knowledge on the part of the manager, a manager's constructive knowledge could be imputed to the employer as actual knowledge of harassment, and the court finds no support for such a theory in Eleventh Circuit precedent.

In *Faragher*, the court was persuaded that the employer did not have notice because city officials, or higher management, were located in a remote location, and the discrete incidents of harassment occurred intermittently over a long period of time. *Id.; see also Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir.1997) (identifying constructive knowledge factors as the remoteness of the location of the harassment as compared to the location of management, whether the harassment occurs intermittently over a long period of time, whether the victims were employed on a part-time or full-time basis, and whether there were only a few, discrete instances of harassment).

Some of the concerns expressed by *Faragher* are not as apparent in this case. That is, although upper management was located remotely from the Winn Dixie store, district managers visited the store once or twice a week on average, and the employees were employed on a full-time basis. Therefore, the court must examine the nature and quality of the evidence with regard to the alleged instances of harassment and determine whether, in the totality of the circumstances, there is evidence that conduct which occurred was sufficiently severe and pervasive to have put WDM higher management on notice of the existence of a hostile environment.

The Plaintiff has provided evidence that Williamson placed his hand on the Plaintiff's buttocks and that he put his hand inside her blouse. The Plaintiff also has provided evidence that two sexually suggestive remarks were made on at least two occasions: Williamson said that he wanted something that was not on the menu when the Plaintiff asked him what he wanted for lunch, and Williamson requested a "furburger," which the Plaintiff contends is a vulgar remark. The Plaintiff also provided evidence of one comment made by Williamson, i.e., saying "um, um, um" while the Plaintiff was bent over, that was said on almost a daily basis. Portera Deposition, page 107. The Plaintiff also testified that during some of her hugs with Williamson, she told him "that's enough," but he would keep hugging her and moaning. *Id.* at 276.

WDM argues that this court should conclude that there is not enough evidence to indicate that the atmosphere at the Winn Dixie store at which the Plaintiff worked was sufficiently severe and pervasive so as to put WDM on notice of a hostile environment. WDM presents evidence that the Plaintiff and Williamson ate lunch together and that even after Williamson allegedly harassed her when she asked him what he wanted for lunch and he replied that what he wanted was not on the menu, she continued to ask him what he wanted for lunch. Portera Deposition, page 336. The Plaintiff also testified that she and Williamson took breaks together, and that it was possible that sometimes she would let him know that she was going on a break so that he could join her. *Id.* at page 375. The Plaintiff also testified that some of the hugs she and Williamson engaged in were consensual, although she found hugs where he would make moaning sounds to be offensive. *Id.* at 276. The Plaintiff invited Williamson and another employee to eat lunch at her home in March of 1992 or 1993. *Id.* at page 186. When asked about a kiss between herself and Williamson on New Year's Eve, the Plaintiff testified that the kiss did not offend her, and she guessed that she kissed Williamson back. *Id.* at page 430. The Plaintiff also gave Williamson a haircut at work after February of 1992. *Id.* at page 417.

In addition, when Lee Sims conducted his investigation of the Plaintiff's complaint, he filed a report in which he stated that employees whom he interviewed stated that they knew the Plaintiff and Williamson were friends, that they had seen Williamson hug the Plaintiff, and that they had also seen the Plaintiff hug Williamson. Lee Sims Affidavit, Exhibit D, page 3. WDM also argues that the Plaintiff had opportunities to complain about Williamson's conduct during Associate Payoff Interviews, but did not, and that when she finally did complain, WDM took immediate action.

Based upon the evidence which has been provided to the court, the court cannot conclude that the offensive conduct identified by the Plaintiff, including two incidents of offensive touching, some non-consensual hugs, two

sporadic comments of an arguably sexual nature, and a daily comment of an arguably sexual nature, when taken together with evidence of conduct which the Plaintiff admits was consensual, could have put a reasonable person on notice of the existence of a hostile environment.[5] The court finds it significant that WDM has not merely disputed that the Plaintiff's evidence is sufficient to have put a reasonable person on notice, but has pointed to portions of the Plaintiff's own deposition where she admitted to several and repeated instances of consensual conduct between herself and Williamson. Given the Plaintiff's own testimony that she engaged in some consensual activity at work, and that at least one activity—hugging—sometimes was consensual and at other times was not consensual, the court concludes that, in the totality of the circumstances, the alleged hostile environment was not sufficiently severe and pervasive to put WDM on notice. WDM is, therefore, entitled to summary judgment on the hostile environment claim.[6]

*Title VII Claim for Retaliation*

A claim for retaliation requires a showing that (1) the plaintiff engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities. *Little v. United Technologies,* 103 F.3d 956, 959 (11th Cir. 1997). WDM has moved for summary judgment on the basis that no adverse employment action was taken against the Plaintiff in this case since she voluntarily resigned.

The Plaintiff has responded by arguing that she has claims for retaliation and constructive discharge which should be treated together for purposes of the motion for summary judgment. *See Landgraf v. USI Film Products,* 968 F.2d 427 (5th Cir.1992) (recog-

nizing that constructive discharge can be an adverse employment action within the context of a retaliation claim); *Peters v. Community Action Committee, Inc.,* 977 F.Supp. 1428 (M.D.Ala.1997) (analyzing retaliation claim based on constructive discharge). To prove constructive discharge, a plaintiff must provide evidence that her working conditions were so intolerable that a reasonable person in her position would be compelled to resign. *Morgan v. Ford,* 6 F.3d 750 (11th Cir.1993).

According to the Plaintiff, the treatment suffered by the Plaintiff after she filed her complaint resulted in the creation of a work environment which was so intolerable that the Plaintiff was forced to resign. The Plaintiff states that the initial decision to transfer the Plaintiff was distressing because she feared that a transfer would make it appear as though she had done something wrong. She argues that when she declined to be transferred, she was isolated by Stan Sims, she was excluded from management meetings, and she received hostile treatment from her co-workers. She offers the deposition of Mary McCall in which she states that some employees who worked in the deli were not "keen" on the Plaintiff's having filed a complaint and so they ignored her. The Plaintiff also testified that an outside vendor knew about the complaint that she had filed, but she also stated that she did not know who told the vendor about her complaint, and that she did not have information to suggest that Stan Sims informed the vendor about her complaint. Portera's Deposition, page 170. The Plaintiff argues that these incidents affected a term, condition, or benefit of employment because she was forced to resign.

WDM responds first that it is ironic that the Plaintiff points to the transfer which was initially going to be made of her, since the

---

5. The court notes that even if constructive knowledge of Stan Sims could be relied on based on his role in the sexual harassment policy, the court would conclude that the evidence provided is also insufficient to put Stan Sims on notice of a hostile environment, given the Plaintiff's testimony as to numerous and continual incidents of consensual activity.

6. There is some precedent in the Eleventh Circuit for imputing liability to the employer where a participant in the harassment is a low-level man-

ager charged with the responsibility of remedying harassment. *See Splunge v. Shoney's Inc.,* 97 F.3d 488 (11th Cir.1996). However, the Eleventh Circuit premised its holding on the fact that the environment was pervasive and the managers were inextricably intertwined in the environment. *Id.* at 490. In light of *Faragher,* therefore, the court finds that liability cannot be premised on the involvement of managers in the harassment without a concomitant finding of a severe and pervasive environment.

Plaintiff herself initially requested a transfer. Portera's Deposition, page 146. With respect to the Plaintiff's statement that she was excluded from management meetings, WDM cites to portions of the Plaintiff's deposition in which she states that she was told that she need not attend one manager's meeting because there was no one else available to cover her department. Plaintiff's Deposition, page 214. The Plaintiff testified that she had no evidence that this explanation was false. *Id.* The Plaintiff also stated that although she did not attend this manager's meeting, she had attended other manager's meetings after she filed her complaint. *Id.* at 210.

The Plaintiff has stated that co-employees could only have learned about her complaint from management, but the Plaintiff has also argued that WDM should have instructed the person who were interviewed about her complaint to keep the inquiry confidential. The Plaintiff has provided no evidence to establish that WDM made known to employees outside of those who were interviewed that the Plaintiff filed a complaint. In addition, WDM has presented evidence that the co-employees who were interviewed were told to keep the information confidential. Lee Sims Deposition, page 88.

The court concludes that the evidence provided by the Plaintiff does not raise a question of fact as to whether WDM acted in retaliation or as to whether the Plaintiff was subjected to intolerable working conditions and that a reasonable person in her position would be compelled to resign. The only evidence before the court as to the working conditions of the Plaintiff is her statement, without explanation, that Stan Sims isolated her, and her evidence that she was ignored by some employees, and that she considered the work atmosphere to be cold. The court cannot conclude that this evidence is sufficient to establish that a reasonable person would have felt compelled to resign. *See e.g., Lombardo v. Oppenheimer,* 701 F.Supp. 29 (D.Conn.1987) (finding no evidence of constructive discharge where the plaintiff claimed she was treated coldly). Furthermore, there is no evidence which would establish that WDM played any role in co-

employees' treatment of the Plaintiff. WDM is, therefore, entitled to summary judgment on the Plaintiff's retaliation and constructive discharge claim.

### State Law Claims

The Plaintiff has brought several state law claims against Williamson individually including outrage, invasion of privacy, and assault and battery. The Plaintiff seeks to hold WDM responsible for these intentional torts on the basis of *respondeat superior.* The Plaintiff also seeks to hold WDM liable for negligent hiring, supervision, and training of Williamson.

### Outrageous Conduct

The Plaintiff has claimed that Williamson engaged in outrageous conduct. To recover under the tort of outrageous conduct in Alabama, a plaintiff must prove that: (1) "the defendant either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from its conduct;" (2) "the defendant's conduct was extreme and outrageous;" and (3) "the defendant's conduct caused emotional distress so severe that no reasonable person could be expected to endure it." *Jackson v. Alabama Power Co.,* 630 So.2d 439, 440 (Ala.1993) (citing *American Rd. Serv. Co. v. Inmon,* 394 So.2d 361 (Ala.1980) (adopting the tort of outrageous conduct in Alabama)). In other words, the conduct complained of must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.* The tort of outrageous conduct only applies "in the most egregious circumstances." *Thomas v. BSE Indus. Contractors, Inc.,* 624 So.2d 1041, 1044 (Ala. 1993). As the Alabama Supreme Court has stated,

[M]ere insults, indignations, threats, annoyances, petty oppressions, or other trivialities [do not constitute outrageous conduct]. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language and to occasional acts that are definitely inconsiderate and unkind.

*Surrency v. Harbison,* 489 So.2d 1097, 1105–06 (Ala.1986) (internal quotation marks omitted). In fact, the only category of outrageous conduct which has been recognized by the Alabama Supreme Court that might arguably be applicable in this case is that of "egregious sexual harassment." *Thomas,* 624 So.2d at 1044.

WDM has argued that the evidence provided by the Plaintiff does not rise to the level of outrageous conduct which has been recognized by the Alabama Supreme Court. The Plaintiff responds with evidence that the emotional distress that she has suffered has been extreme, requiring psychological treatment. To make out a claim for outrageous conduct, however, both the conduct and the emotional distress must be extreme.

The Alabama Supreme Court has made it clear that the tort of outrageous conduct is a limited remedy to be applied in only egregious circumstances. *Busby v. Truswal Systems Corp.,* 551 So.2d 322, 328 (Ala.1989). The Plaintiff has also argued the egregious touching which occurred in this case distinguishes it from precedent cited by WDM which found that conduct did not rise to the level of outrageous conduct. The Plaintiff cites no case, however, and the court has found none, in which the Alabama Supreme Court has held that the incidents of offensive touching presented in this case, even when combined with the Plaintiff's other evidence, is the type of sexual harassment which constitutes outrageous conduct. Although the Plaintiff contends that the touching in this case meets the *Inmon* standard, the Alabama Court of Civil Appeals has recently applied the *Inmon* standard and concluded that incidents of touching, including poking female employees under their armpits near their breasts, putting hands on a female employee's waist, rubbing against an employee as the harasser passed through a door, and touching the female employee on the leg, combined with comments and attempts to look up the employee's skirt did not establish outrageous conduct. *See Turner v. Hayes,* —— So.2d ——, No. 2951010, 1997 WL 272428 (Ala.Civ.App. May 23, 1997), *see also Saville v. Houston County Healthcare Authority,* 852 F.Supp. 1512 (M.D.Ala.1994) (granting summary judgment on outrageous conduct claim where incidents including poking a female employee in the rib cage and touching or grabbing the employee's buttocks). Consequently, the evidence of touching provided by the Plaintiff does not, even in combination with her other evidence of harassment, rise to the level of outrageous conduct which has been recognized by Alabama courts.

### Invasion of Privacy

As to the claim for invasion of privacy, the Plaintiff is proceeding under the "intrusion upon seclusion" theory of invasion of privacy. *See Phillips v. Smalley Maintenance Servs., Inc.,* 435 So.2d 705, 708 (Ala. 1983) (holding that "intrusion upon the plaintiff's physical solitude or seclusion" is one of four acts that constitute an invasion of privacy). In *Busby v. Truswal Systems Corporation,* 551 So.2d 322 (Ala.1989), the Alabama Supreme Court noted that "there must be something in the nature of prying or intrusion and the intrusion must be something which would be offensive or objectionable to a reasonable person." *Id.* at 323 (internal quotations omitted). The court also noted that marriage and sexual concerns are entitled to privacy protection. *Id.* The Alabama Supreme Court has further explained that there is a wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities. *Phillips v. Smalley Maintenance Services,* 435 So.2d 705 (Ala.1983).

Another court in this district has described Alabama Supreme Court precedent on invasion of privacy as a spectrum ranging from extreme and outrageous sexual harassment to questioning about an employee's sex life behind locked doors for a period of over three months combined with sexual advances. *See Brassfield v. Jack McLendon Furniture, Inc.,* 953 F.Supp. 1438 (M.D.Ala.1996). The court finds this description of Alabama Supreme Court precedent to be persuasive. Under this interpretation, evidence of an invasion of privacy must be a course of conduct which rises to a level that has been previously held to constitute an invasion of privacy.

In *Busby*, the court found that there was extreme and outrageous sexual harassment based on seventeen separately listed instances of lewd comments, touching, and gestures. In finding that there was an invasion of privacy, the court considered all of the evidence and did not find any one element to be dispositive. In another case, the court found that there was an invasion of privacy where the employer questioned a female employee two or three times a week for three months behind "locked doors" about the employee's sexual experiences, made coercive sexual advances, and the employee suffered severe mental trauma. *Phillips v. Smalley Maintenance Services,* 435 So.2d 705 (Ala.1983). However, in a case in which a president of the company told a female employee about an affair that he had, asked the employee to have dinner and to be available when he was in town, tried to kiss the employee, engaged in lurks or innuendoes, touched her arm and tried to have her to be fired, the court held that there was insufficient evidence to constitute a claim of invasion of privacy. *McIsaac v. WZEW–FM Corp.,* 495 So.2d 649 (Ala. 1986).

The conduct alleged by the Plaintiff is not as severe as that in *Busby* in that it does not amount to extreme and outrageous sexual harassment. The conduct also did not consist of continual intrusive inquiries into sexual interests or activities as did the conduct in *Phillips*. Instead, the conduct at issue is more analogous to that in *McIsaac*, even though the facts in *McIsaac* could be said to be more extreme since the perpetrator in *McIsaac* was in a position of more power than was Williamson. Although the Plaintiff has argued that the evidence she has provided is more severe than that in *McIsaac*, because Williamson placed his hand inside of her blouse, the court does not find that this instance of touching is sufficient to constitute an invasion of privacy, nor does this instance of harassment, combined with the other evidence, rise to the level of intrusion which was recognized in either *Busby* or *Phillips*. The court concludes, therefore, that the Plaintiff has not provided sufficient evidence to establish that any intrusion suffered by the Plaintiff would result in outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities. *See Durham v. Philippou,* 968 F.Supp. 648 (M.D.Ala.1997) (finding that conduct which did not rise to the level of the conduct in *Busby* or *Phillips* did not amount to an invasion of privacy even though the conduct was reprehensible). Accordingly, the Defendants are entitled to summary judgment on this claim.

■ WDM has argued that it cannot be held liable for Williamson's actions even if Williamson could be held liable for invasion of privacy. An employer can be held indirectly liable for acts of its employees where the acts were done in the line and scope of employment or in furtherance of the employer's interest. *Potts v. BE & K,* 604 So.2d 398 (Ala.1992). An employer can also be held directly liable if the plaintiff shows that the employer (1) had knowledge of the tortious conduct, (2) that based on this knowledge, the employer knew or should have known that the conduct constituted sexual harassment, and (3) that the employer failed to take adequate steps to remedy the situation. *Id.* at 400. For the reasons discussed in connection with the Plaintiff's claim for hostile environment under Title VII, the court concludes that, even if there had been an invasion of privacy by creation of a hostile environment, WDM cannot be held indirectly liable for Williamson's actions because there is no evidence that Williamson was acting within the scope of his employment or in furtherance of his employment, and WDM could not be held directly liable because the Plaintiff has failed to provide sufficient evidence of knowledge, or that the employer failed to take adequate steps to remedy the situation once it had actual knowledge.

### Assault and Battery

■ The Plaintiff has also claimed that Williamson may be held liable for assault and battery. To recover under Alabama law, a plaintiff must provide evidence "touching by one person of the person of another in rudeness or anger." *Whitlow v. Bruno's, Inc.,* 567 So.2d 1235, 1239 (Ala.1990) (internal citations and quotations omitted).

■ Williamson has moved for summary judgment on the assault and battery claim

arguing that the Plaintiff has admitted that she was never touched violently by Williamson. There is, however, no requirement under Alabama law that there be injury or a threat of injury to constitute an assault and battery. The wrong "consists, not in the touching, so much as in the manner or spirit in which it is done, and the question of bodily pain is important only as affecting damages." *Surrency v. Harbison,* 489 So.2d 1097, 1104 (Ala.1986).

Williamson has also argued that the Plaintiff and he were friends. However, Williamson has not provided any evidence which would indicate that his touching of her buttocks or putting his hand in her blouse was not considered to be rude conduct by the Plaintiff. The Plaintiff, on the other hand, has provided evidence in which Williamson stated in his deposition that when he touched her buttocks the Plaintiff was "surprised." Williamson Deposition, page 42. Williamson also stated that the Plaintiff was "shocked" when he put his hand in her blouse. Williamson Deposition, page 45. Therefore, the court concludes that there is a question of fact as to whether the touching constituted an assault and/or battery in this case.

Williamson has also stated that the state law claims are barred if based on actions occurring two years before the filing of the complaint. Williamson does not, however, provide to the court any evidence that incidents of touching relied upon by the Plaintiff occurred outside of the two year period. In fact, the evidence appears to be undisputed that the alleged touching of the Plaintiff's buttocks by Williamson occurred within the week before the Plaintiff complained to Sims on June 5, 1995. Therefore, the claim for assault and battery contained within the Complaint filed on February 11, 1997 is timely filed. Accordingly, Williamson's Motion for Summary Judgment is due to be DENIED as to the claim for assault and battery.

■■■■ WDM has moved for summary judgment arguing that it cannot be held liable for Williamson's alleged assault and battery. For an employer to be held liable for the intentional torts of its agent, the plaintiff must offer evidence (1) that the agent's wrongful acts were committed in the line and scope of employment; or (2) that the acts were committed in the furtherance of business of the employer; or (3) that the employer participated in, authorized, or ratified the wrongful acts. *Mardis v. Robbins Tire & Rubber Co.,* 669 So.2d 885, 889 (Ala.1995).

The Alabama Supreme Court has stated that

"[I]f an employee is engaged to perform a certain service, whatever he does to that end, or in furtherance of the employment, is deemed by law to be an act done within the scope of the employment.... The conduct of the employee ... must not be impelled by motives that are wholly personal, or to gratify his own feelings or resentment, but should be in protection of the business of his employment."

*Doe v. Swift,* 570 So.2d 1209, 1211 (Ala.1990) (quoting *Solmica of the Gulf Coast, Inc. v. Braggs,* 285 Ala. 396, 232 So.2d 638, 642 (1970)). In *Doe,* the Alabama Supreme Court held that assault and battery by an employee is purely personal and outside the line and scope of his employment. *Id.* at 1211–12 & n. 3 (citations omitted). Therefore, the court concludes that Williamson was not acting within the line and scope of his employment or in furtherance of his employment so as to subject his employer, WDM, to liability for the alleged assault and battery.

■■■■ The Plaintiff also claims that WDM ratified Williamson's alleged assault and battery. To show ratification, a complaining employee must show that the employer (1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee, (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted ... a tort; and (3) that the employer failed to take adequate steps to remedy the situation. *Mardis v. Robbins Tire & Rubber Co.,* 669 So.2d 885, 889 (Ala. 1995).

It is undisputed that the Plaintiff complained to Sims about Williamson on June 5, 1995. The letter which the Plaintiff has submitted as evidence indicates that she in-

formed Sims that Williamson had touched her on her buttocks. *Sparks v. Regional Medical Center Board,* 792 F.Supp. 735 (N.D.Ala.1992) (must have knowledge of the specific torts). However, as was discussed in connection with the Plaintiff's claim for inadequacy of WDM's response to her complaint of sexual harassment, this court concludes that WDM took prompt and appropriate actions to prevent Williamson from engaging in acts of harassment in the future. The Plaintiff testified that once Williamson was transferred, she did not suffer sexual harassment of any type. Portera's Deposition, page 196. Therefore, the court concludes that the Plaintiff has failed to provide sufficient evidence from which a reasonable jury could conclude that WDM ratified the conduct of Williamson.

### Negligent Hiring, Supervision, and Training

■ The Plaintiff argues that WDM should be held liable for its negligent hiring, training, and supervision of Williamson.

■ The Plaintiff must show that the alleged incompetence of the employee was actually known to the employer or was discoverable by the employer if it had exercised care and proper diligence. *Ledbetter v. United Am. Ins. Co.,* 624 So.2d 1371 (Ala. 1993). There has been no evidence provided to this court which would allow a reasonable finder of fact to conclude that WDM knew or could have discovered that Williamson would engage in sexual harassment before WDM hired Williamson. WDM is, therefore, entitled to summary judgment on the negligent hiring claim.

The Plaintiff does not appear to draw a distinction between her claim for negligent supervision and her claim for negligent training. The Alabama Court of Civil Appeals also has noted that there is not an identifiable difference between these two claims in Alabama cases. *See Zielke v. AmSouth Bank, N.A.,* 703 So.2d 354, 358 n. 1 (Ala.Civ. App.1996). Therefore, the court will address these claims as one claim.

In Alabama, to recover against an employer under the theory of negligent supervision, a plaintiff first must show "by affirmative proof that the alleged incompetence of the employee was actually known to the employer or was discoverable by the employer if it had exercised care and proper diligence." *Ledbetter v. United Am. Ins. Co.,* 624 So.2d 1371, 1373 (Ala.1993).

WDM argues that the same evidence and arguments which were relied on in its discussion of the Title VII claims are applicable to the negligent training and supervision claims and demonstrates that WDM did not have actual knowledge or could not have known if it had exercised proper diligence. The Plaintiff's response is based on the argument that the only training that Williamson ever received as to sexual harassment was that he was told to be aware of the "poster booklet." According to the Plaintiff, Williamson's incompetence was foreseeable given this lack of training. The Plaintiff also urges this court to consider that, in the Plaintiff's view, WDM's sexual harassment policy was not comprehensive or effective.

Although it is not clear, it appears that the Plaintiff may be arguing that WDM was negligent for not training Williamson in the WDM sexual harassment policy, regardless of whether or not WDM knew or should have known that Williamson would engage in harassment. This, however, is not the standard applied by the Alabama Supreme Court. An employer must know or should have known by due diligence of an employee's incompetence. *Ledbetter,* 624 So.2d at 1373. In one decision, the Alabama Supreme Court did rely on absence of training an employee when he was first hired, but the court noted that the training was as to the store's policy in detaining and questioning a suspected shoplifter, one of the employee's job duties. *See Big B, Inc. v. Cottingham,* 634 So.2d 999 (Ala.1993). In that same decision, however, with respect to an accusation of sexual harassment, the court did not reference any training, but instead found that the employer failed to adequately investigate an earlier accusation of sexual harassment. *Id.* at 1003.

As was earlier discussed, the court does not find that the Plaintiff has provided sufficient evidence to establish that WDM, through its district managers or Stan Sims, knew or should have known that Williamson had created a hostile environment by engaging in sexual harassment. The Plaintiff has

also argued that WDM had knowledge of Williamson's incompetence because he was demoted during the time in which he was employed by WDM. The Plaintiff has not, however, provided any evidence that Williamson was demoted for reasons which related to sexual harassment. Instead, the Plaintiff cites to Williamson's deposition in which he states that he was demoted because he was told by the District Manager that he was not adequately performing his job duties. Williamson's Deposition, page 13. There is no evidence that any prior complaints of sexual harassment had been made against Williamson. Therefore, the court concludes that the Plaintiff has not created a question of fact as to whether WDM knew or should have known of Williamson's incompetence with regard to creation of a hostile environment. WDM is entitled to summary judgment on the negligent training/supervision claim.

### V. CONCLUSION

For the reasons discussed, the court concludes that the Motion of Winn Dixie Stores, Inc. to Dismiss or for Summary Judgment is due to be GRANTED, the Motion for Summary Judgment of Winn Dixie Montgomery, Inc. is due to be GRANTED, and the Motion for Summary Judgment of Greg Williamson is due to be GRANTED in part and DENIED in part.